195                 619
f217                  20

## Potts *v.* Philadelphia.

*Municipalities—Municipal contract—Cities of the first class—Act of June 1,* 1885, *P. L.* 51, *art.* 14, *sec.* 1.

Under the Act of June 1, 1885, art. 14, sec. 1, relating to the signing of contracts by the mayor and controller of a city of the first class, a court of equity has no power to enjoin the mayor and controller from signing a contract for public lighting unless the contract is one which they cannot lawfully sign.

*Municipalities—Municipal contract—Cities of the first class—Contract for electric lighting—Department of public safety.*

Where a municipal contract is properly executed by the officers of the

city, to whom such power is given under the law, the fact that a wrong department advertised for proposals and determined the bids, is a mere irregularity which will not avoid the contract.

Where under the laws and ordinances regulating the government of a city of the first class, it is certain that the power to advertise for proposals and determine the bids for public electric lighting belongs either to the department of public safety, or to the department of public works, and it appears from a consideration of the act, the ordinances and the practice for many years, that it is highly probable that such power really belongs to the department of public safety, a court of equity will not at the instance of a third party enjoin the execution of a contract for electric lighting because the advertisement for proposals and determination of the bids was made by the department of public safety.

*Municipalities—Municipal contract—Fraud—Injunction.*

On a bill in equity to restrain the execution of a municipal contract, where there is an allegation of fraud in fact in not awarding the contract to the lowest bidder, and in the manner in which the bids were made, the Supreme Court will not reverse a finding of fact by the court below on sufficient evidence that there was no fraud or collusion on the part of the officers of the municipality.

*Municipalities—Municipal contract—Electric lighting—Electric companies—Fraud.*

Where a city accepts a bid for the electric lighting of the whole of the city, it is no proof of fraud to show that in a bid for a single district, comprising less than one-twentieth part of the total number of lights required, a lower price was bid by one company than the price named for that district in the general bid that was accepted; nor can any inference of fraud be drawn from the fact that one company owned a majority of the stock of all the other bidding companies, except the company which made the lower bid in the one district. Such ownership is authorized by law and is as·consistent with absolute innocence of a fraudulent purpose as it is with guilt of such a purpose.

Argued March 21, 1900.    Appeal, No. 440, Jan. T., 1899, by plaintiff, from decree of C. P. No. 3, Phila. Co., Sept. T., 1899, No. 1105, dismissing bill in equity in case of George E. Potts v. city of Philadelphia, Samuel H. Ashbridge, Mayor, Abraham L. English, Director of Public Safety; John M. Walton, Comptroller; the Philadelphia Electric Company, the Brush Electric Light Company, the Southern Electric Light and Power Company, the Manufacturers' Electric Company, the Diamond Electric Company, the Suburban Electric Company, the Germantown Electric Light Company, the Poweltown Electric Company, the Wissahickon Electric Light Company, and the Kensington Electric Company.    Before GREEN, C. J., McCOLLUM, DEAN, FELL and MESTREZAT, JJ.    Affirmed.

Bill in equity for an injunction.

The bill averred that complainant was a citizen and taxpayer of the city of Philadelphia.    The bill further averred as follows:

The director of the department of public safety, prior to November 20, 1899, advertised for proposals for furnishing electric arc lights during the year 1900 to the said city of Philadelphia.

That in answer to said advertisments for proposals, the electric companies, defendants, submitted bids covering the sections of said city set forth in the following schedule:

| Name of Bidder. | Number of lights located in the territory covered by the plants and lines of the respective bidders, and showing the approximate capacity of such plants. | Wards covered in whole or in part by the several bids. | Price per night per light bid for overhead service. |
| --- | --- | --- | --- |
| Brush Electric Light Company . . | 2069 | 11, 12, 13, 14, 15, 6, 10, 9, 8, 5, 7 . . | 30 |
| Brush Electric Light Company (now furnished from plant of Northern Electric Light and Power Company) . . . . . . . . . . | 672 | 17, 16, 29, parts of 18, 31, 19, 20, 32 . . . | 31½ |
| Manufacturers' Electric Company, | 593 | 25, 37, parts of 33, 19, 22, 20 | 33 |
| Southern Electric Light and Power Company . . . . . . . . | 1385 | 30, 1, 2, 3, 4, 36 26 and 39 | 32 |
| Suburban Electric Company . . . | 576 | 23 and 35 . . | 35½ |
| Powelton Electric Company . . . | 841 | 24, 34, 27, 40 . | 32 |
| Diamond Electric Company . . . | 541 | 28, part of 33, 38 and 32 . | 33 |
| Germantown Electric Light Company . . . . . . . . . . . | 253 | 22 | 35¼ |
| Wissahickon Electric Light Company . . . . . . . . . . . | 214 | 21 and part of 38 . . . . | 34 |
| Kensington Electric Company . . | 376 | Parts of 18, 19, and 31 . . | 20 |

In addition to the foregoing bids, the defendant, the Brush Electric Light Company, submitted a bid for all lights south of Allegheny avenue, between Delaware and Schuylkill rivers, at thirty cents per light per night, and north of Allegheny avenue,

between Delaware and Schuylkill rivers, and all of the city west of the Schuylkill river at thirty-one cents per light per night. This last-mentioned bid covered all the public electric arc lights in the said city.

With the exception of the Kensington Electric Company all of the companies bidding to furnish electric lights are owned and controlled by the defendant, the Philadelphia Electric Company, through ownership by it of the majority of the stock of the said several companies, the management and direction of each of said companies being controlled and directed by the Philadelphia Electric Company. That the several bids of the companies controlled by the Philadelphia Electric Company were fraudulent and collusive, and made in the manner and form in which they were submitted for the purpose of giving an appearance of competition when in point of fact there was none. That it was known to the officials of the city of Philadelphia that the Brush Electric Light Company's plant was insufficient to enable it to comply with its bid to supply the entire city of Philadelphia, and that it could not be made sufficient for the purpose of complying with the bid within the limited time, and that to enable it to comply with its bid, the plants of the other bidders controlled by the Philadelphia Electric Company would have to be used. That the city officials well knew at the time of the making of said bids that it was the intention of the Philadelphia Electric Company to use the plants of such other bidders for the purpose of complying with the bid of the Brush Electric Light Company.

The plaintiff charged that it was well known to the parties making said bids, and to the department of public safety, that there was no real competition for said electric lighting except as between the companies controlled by the Philadelphia Electric Company on the one hand and the Kensington Electric Company on the other, and that the bids of the underlying companies controlled by the Philadelphia Electric Company were fixed at the prices therein set forth to falsely and fraudulently give the appearance to the blanket bid of the Brush Electric Light Company of being lower, when in truth and in fact the Kensington Electric Company's bid of twenty cents per light per night is lower within the district bid for than the bid of the Brush Electric Light Company of thirty cents per light per night over the same district.

That the department of public safety imposed unreasonable and onerous conditions in the matter of bidding by increasing the amount of deposit money required to accompany each bid from $5,000, as heretofore, to the sum of $10,000, and this when the department well knew that there were but two competitive bidders, and that the Kensington Electric Company for the last seven years, within substantially the same district embraced within its present bid, has furnished the city of Philadelphia with the electric lighting therein to the satisfaction of said city.

That the defendant Abraham L. English, director of the department of public safety, has accepted the blanket bid of the Brush Electric Light Company, and awarded to it the contract for electric arc lighting of the streets of Philadelphia for the year 1900.

The plaintiff prayed relief as follows :

1. That by preliminary, and, after hearing, by final injunction, the court restrain the said defendant, Samuel H. Ashbridge, mayor of the city of Philadelphia, and Abraham L. English, director of the department of public safety of said city, from signing a contract, and John M. Walton, controller, from countersigning said contract with the Brush Electric Light Company for supplying electric arc lights to the entire city of Philadelphia for the year 1900, in accordance with its bid as aforesaid.

2. That it be decreed that the several bids submtted by the Brush Electric Light Company, the Southern Electric Light and Power Company, the Manufacturers' Electric Company, the Diamond Electric Company, the Suburban Electric Company, the Germantown Electric Light Company, the Powelton Electric Company, and the Wissahickon Electric Light Company were fraudulent and collusive, and null and void.

3. That it be decreed that the lighting of the public streets of the city of Philadelphia with electric lights appertains to and is under the supervision and control of the department of public works, and does not appertain and is not under the supervision and control of the department of public safety, and that the advertising for proposals and the awarding of contract for electric lighting by the director of the department of public safety is illegal and void.

4. That by preliminary, and, after hearing, by perpetual injunction, the said defendant, the Brush Electric Light Company,

be restrained from entering into a contract with the city of Philadelphia for furnishing to said city electric lights for the year 1900 in accordance with its bid, and from performing said contract.

5. Further relief.

The defendants, except the Kensington Electric Light Company, demurred to the bill.

The court in an opinion by McMICHAEL, J., sustained the demurrer and dismissed the bill.

*Error assigned* was the decree of the court.

*M. Hampton Todd*, with him *Frank S. Christian*, for appellant.—The act of the director of public safety in advertising for proposals and in awarding contract for electric arc lighting of the streets, alleys and highways of the city of Philadelphia, for the year of 1900 is contrary to the express provision of the act of assembly of June 1, 1885 : Douglass v. Com., 108 Pa. 559; Mazat v. Pittsburg, 137 Pa. 548 ; American Pavement Co. v. Wagner, 139 Pa. 623 ; Interstate, etc., Paving Co. v. Phila., 164 Pa. 477 ; Reuting v. Titusville, 175 Pa. 512; Boyd v. U. S., 116 U. S. 616.

The bids submitted by the several electric companies under the control of the Philadelphia Electric Company were fraudulent : People v. Stephens, 71 N. Y. 546 ; Nelson v. Mayor of New York, 5 N. Y. Supp. 688 ; Anderson's Case, 109 N. Y. 554; In re Del. & Hudson Canal Co., 8 N. Y. Supp. 353 ; Erie v. Reed, 113 Pa. 468.

*James Alcorn*, assistant city solicitor, *John G. Johnson* and *Charles E. Morgan, Jr.*, with them *John L. Kinsey*, city solicitor, for appellee.—It is not unlawful under the Bullitt bill for the mayor of the city of Philadelphia to enter into a contract for electric lighting where the advertisement for proposals and the subsequent conditional award has been made by the director of public safety and not by the director of public works: Philadelphia v. Gorgas, 180 Pa. 296 ; Summers v. Paist, 19 Phila. 297.

The appellant is in error in stating that this contract could only be made with the lowest bidder, as provided in the Act of

assembly of May 13, 1856, P. L. 567, sec. 26: Com. v. Mitchell, 82 Pa. 343; Findley v. Pittsburg, 82 Pa. 351; Douglass v. Com., 108 Pa. 559; Interstate, etc., Paving Co. v. Phila., 164 Pa. 477; Reuting v. Titusville, 175 Pa. 512; Carroll v. Phila., 183 Pa. 55.

The public policy of a state is to be deduced from the general course of its legislation: Bald Eagle Valley R. R. Co. v. Penna. R. Co., 171 Pa. 284; Northern Central Ry. Co. v. Walworth, 193 Pa. 207.

It is perfectly well settled that the ownership by one corporation of all the stock in another not only is not unlawful, but does not amount to a merger or a consolidation of said companies. They are treated and regarded by the law as distinct artificial persons as to their corporate acts. It has repeatedly been held that, notwithstanding the law of this state forbidding a foreign corporation to own real estate in Pennsylvania, it may become a purchaser of all the stock of a domestic corporation vested with the power to purchase and to own land, and that in all matters where the rights of the respective corporations are called in question each will be treated and regarded by the law as entirely independent and distinct: Bidwell v. Pittsburg, etc., Pass. Ry. Co., 114 Pa. 535; Commonwealth v. N. Y., Lake Erie & Western R. R. Co., 132 Pa. 591; White v. Ryan, 15 Pa. C. C. R. 170; Hartwell v. Buffalo, Roch. & Pitts. Ry. Co., 19 Pa. C. C. R. 231; Pullman Co. v. Missouri Pac. Ry. Co., 115., U. S. 587.

OPINION BY MR. CHIEF JUSTICE GREEN, May 7, 1900:

The object of the bill in this case practically is to restrain the mayor of Philadelphia from signing, and the controller from countersigning, a contract for lighting the city with electric light during the year 1900. The terms of the proposed contract had been reached by the biddings of various electric companies, after public notice had been given that bids would be received, and the director of the department of public safety had accepted the bid of the Brush Electric Light Company, and had awarded the contract to that company. Thereupon the plaintiff's bill was filed to restrain the execution of the contract. By the express terms of the Act of June 1, 1885, P. L. 51, art. 14, sec. 1, it is provided that "All contracts relating to city

affairs shall be in writing, signed and executed in the name of
the city by the officer authorized to make the same; and in
cases not otherwise directed by law or ordinance, such contracts
shall be made and entered into by the mayor. . . . All con-
tracts shall be countersigned by the controller." As there is
no law directing any other city official to execute such con-
tracts, it became the plain legal duty of the mayor to sign, and
the controller to countersign, the contract in question. Intrin-
sically, therefore, and upon the purely technical aspect of the
subject it could not be tolerated that an injunction should, or
could, be granted to prevent these officials from doing that
which the law peremptorily says they must do. In other words
if the contract for lighting the city is to be executed at all, it
must be done by these official persons. It follows, hence, nec-
essarily, that unless this contract is one which they cannot
lawfully sign, they must certainly perform that duty.

For the appellant, it is contended that the proposed contract
is an invalid contract for two reasons, first, that the advertising
for proposals and the awarding of the contract were conducted
by the department of public safety, whereas the law requires
that this should be done by the department of public works,
and, second, that the proposed contract was fraudulent in fact.
As to the first of these contentions it is replied, that for six
years preceding the present, it has always been the practice in
the conduct of the city departments to carry on the proceed-
ings for lighting the city with electric light through the depart-
ment of public safety, and not through the department of public
works, and that all the advertising for proposals to light the
city in that manner, the acceptance of bids, and the awarding
of contracts was proceeded with and completed through that
department. And it was also alleged and proved that all the
payments for moneys due by the city under said electric light-
ing contracts, were made by ordinances of councils, duly ap-
proved for that purpose in extinguishment of the liabilities of
the city thus created. And it was also fully averred and proved
that for many years extending as far back as to 1868, the sub-
ject of electricity was committed to a department called the
department of police and fire alarm telegraph, and that ever
since that time that department has had the care and manage-
ment of the police and fire alarm telegraph, and of all telephone

and telegraph poles, wires and fixtures, and of underground electrical conduits, wires, pipes and cables belonging to the city. That by an ordinance approved July 11, 1884, the name of department of "police and fire alarm telegraph" was changed to the "electrical department," and by ordinance approved December 30, 1884, the sum of $36,417.60 was appropriated to said department for lighting certain streets named therein with electric lights, and that similar appropriations were made in increasing sums for the years 1885 and 1886 for the same purpose. That by the terms of the act of 1885, called the Bullitt bill, it was provided that henceforth there should be a department of public safety and that, "the care, management, administration and supervision of the police force, and all matters relating to the public health and the fire and police force, fire alarm telegraph, erection of fire escapes, and the inspection of buildings and boilers, markets and food sold therein, shall be in charge of this department.

It is certainly true that by ordinance of December 30, 1886, section 8, it was ordained that the department of public works should embrace "the erection of public lamps and the lighting and care of same, whether gas, gasoline or electric lights," but it is also true that by the same ordinance, section 3, it was enacted that the department of public safety "shall embrace the present departments of police, health, fire, electrical, erection of fire escapes, etc." By ordinance of June 29, 1889, it was ordained that there should be established in the department of public works a bureau having charge of the lighting of the city to be known as the bureau of lighting. By ordinance of March 30, 1883, the whole subject of laying of conduits, tubes or pipes for electrical conductors, cables or wires, was committed to the department of "police and fire alarm telegraph." By ordinance of February 16, 1886, it was ordained "that the chief of the electrical department be, and he hereby is authorized to issue permits for the erection of such electric light poles and wires as may be required for the lighting of the public streets." In the mean time the ordinance of July 11, 1884, had changed the name of the "department of police and fire alarm telegraph" to "electrical department" and when the ordinance of February 16, 1886, which was enacted in the year following the passage of the Bullitt bill of 1885, went into

effect, it followed, that the subject of street lighting by electricity was committed to the electrical department which was then a department of the department of public safety. It naturally resulted that in the ordinances making appropriations for electric lighting during the years 1885, 1886, and 1887 the appropriations were all made to the electrical department. During the years 1888 to 1893, inclusive, the appropriations for lighting the city with electric lights were included in the appropriations made to the department of public works. Beginning with the year 1893, the ordinances for each year, until and including the year 1899, appropriated the moneys to be paid for electric lighting of the streets to the department of public safety, and during all that time the whole business of the electric lighting of the city was conducted by that department. The manner in which, and the reasons why, the changes were made in the administration of the electric lighting of the city streets were fully explained in the testimony of Daniel R. Walker who was the chief of the electrical bureau. He testified that he had been connected with that bureau for forty-two years. He was asked, " Q. Explain to the court what is the character of the electrical bureau? A. It is a bureau established for the purpose of taking charge of the supervision, maintenance and construction of all city service, as well as all other service in the city, telephone, telegraph, electric light, trolley and all other electrical constructions. They supervise the erection and maintenance on the highways. Q. Is there in any other bureau or department in the city the facilities which are provided by your bureau? A. There is none that have any facilities of the kind. . . . . Q. You stated you were connected with the electrical department for a number of years. During all the time that the city has been contracting for electric lights have they been under the supervision of your bureau? A. Yes ; the entire service since 1883. Q. Even during the time when they introduced appropriations to the department of public works for the bureau of public lighting did your department have superintendence of the electric lighting? A. Yes, sir. Q. It was not done through the department of public works? A. No sir; the location of lights, the maintenance of lights, and everything pertaining to it was under the supervision of the electrical bureau, other than the drawing of the warrants

from 1888 to 1894. That is, the electrical bureau handled the whole thing. Q. Your bureau is an aid or adjunct to the police and fire department of the city is it not? A. Yes, sir. Q. And the police and fire houses are lighted through your bureau, and by these companies, is that so? A. Yes, sir. Q. So that it becomes absolutely necessary for your bureau to take charge of that in connection with the police and fire departments of the city? A. It does, undoubtedly; having all the facilities and the experts in electrical matters to take charge of it. Q. Are there any facilities in the department of public works or bureau of lighting for knowing as to the electric lighting or the manner in which it is performed, or controlling it? A. There is nothing, only the information they obtain from the electrical bureau. Q. There is no force and no facilities in the bureau of lighting for doing that work, is there? A. When electric lights are established, the electrical bureau reports to the bureau of lighting the location of lamps that have been put up so that they can remove or extinguish gas lamps in the vicinity. Q. So that the department of public works has never had anything to do with the electric lighting but drawing the warrants for pay during the few years that the appropriation was made to that department; is that so? A. That is so. . . . Q. In your department is the police and fire alarm telegraph service, is it not? A. Yes; and telephone service and supervision of trolleys and supervision of everything erected on the highways. Q. It has been so there how long? A. Ever since it was established. Q. How long is that? A. Since April 19, 1856. Q. And it so continues to-day? A. Yes; only the name is changed. First it was police and fire alarm telegraph, and then electrical department, and now electrical bureau. . . . Q. Ever since 1894, when the contracts have been bid for, what department of the city has been awarding the contracts? A. The department of public safety. Q. That has been uniformly the case? A. Yes, sir. Q. And the councils appropriated the money requisite to pay those contracts? A. Yes, sir. Q. And the contracts have been signed by whom? A. By the director of public safety. . . . Q. Did you refer to the executing of the contract? A. To the awarding."

It would seem from the foregoing testimony, which was not at all contradicted, that the whole business of electric lighting

of the streets of the city was conducted through the electrical bureau, and that this was a matter of necessity, because there was no other department that possessed the indispensable facilities for transacting that kind of business. It appears also that the electrical bureau was no more than a change of name for the original police and fire alarm telegraph, which always was, and still is, a department of the department of public safety. It is not easy to understand why the appropriation for electric lighting was diverted to the department of public works by the ordinance of June 29, 1889, for that was all the change that was made upon this subject. That ordinance created a bureau of lighting but did not define the functions of that bureau, and there was much other lighting than by electricity which was provided for such as gas, gasoline, naphtha, etc. It is true the appropriations were directed to be made by transfers in the appropriations to the department of public works, but the ordinance contained nothing which changed in any respect the functions of the police and fire alarm telegraph or of the electrical bureau. The ordinance of December 30, 1886, in its 3d section ordained that the department of public safety should " embrace the present departments of police, health, fire, electrical," etc., and, in its 8th section directed that the department should embrace " the erection of public lamps and the lighting and care of same whether gas, gasoline or electric lights " etc., but in no way interfered with or changed the previous association of the police and fire alarm, and electric bureaus with the department of public safety. There is an apparent inconsistency in the provisions of these two sections of the ordinance, though if it were of any great importance, it might well be argued that the provision of the 8th section really was confined to " the *erection* of public lamps and lighting and care of the same," which would not necessarily include lamps erected by other companies who might furnish electricity from poles, wires and lamps erected by themselves. In other words while the erection of public lamps by the city and their care and use, was strictly provided for as something to be done through the department of public works, the purchase of electric light from other sources was something not provided for by the words of the 8th section and therefore remained with the electrical department as provided by the 3d section.

It is not of sufficient consequence however to follow out this line of thought, as it will be readily seen that there might easily exist a contrariety of opinion as to which one of the two great departments of public safety, or public works, possessed the preliminary jurisdiction of conducting the bidding for the contracts. Even conceding that it belonged to the department of public works to advertise for proposals and determine the bids, the same work could be far better done by the department of public safety which possessed all the facilities for conducting that part of the business, and it would amount to nothing more than an irregularity in the method of proceeding prior to the preparation and execution of the contract which must be signed by the mayor and countersigned by the controller, in any event. Such irregularities do not present any sufficient reason for enjoining those officials from performing their duties in the execution of the contract. We had this subject before us in the case of City of Phila. v. Gorgas, 180 Pa. 296, where a contract for paving was signed by the mayor when it was perfectly clear that it should have been signed by the director of the department of public works, and under the express terms of the law the mayor was not authorized to sign it. The absolute execution of the contract is a much more important matter than the question as to which department should advertise for proposals and accept the bids, yet even that defect in the proceedings was held to be only an irregularity. We held that the matter of the signature was not a jurisdictional fact, and hence the signing by the wrong official was not a fatal objection but only an irregularity of which third persons could not be heard to raise questions as between the city and its contractors. We said: " There is no provision avoiding the contract unless it is signed by the officer authorized to make the same, and hence the case falls within the line of decisions where the defects in the contracts are irregularities only, and as to these the rule is perfectly well established that third parties are not permitted to raise questions between the city and its contractors." Precisely the same consideration applies to the present case. There is no provision in the Bullitt bill or in any of the ordinances which relate to the subject, avoiding the transaction if the preliminary advertisements for proposals and acceptance of bids are conducted by the wrong department, and where it is certain

that it does belong to one of these two departments, and highly probable that it really belongs to the department of public safety in any event, it is perfectly manifest that whether it was done by one or the other is not a jurisdictional question and therefore is not open to controversy by third persons. The whole subject was fully considered and discussed in the opinion by Mr. Justice WOODWARD in the case of Fell v. Philadelphia, 81 Pa. 58, and the distinction clearly pointed out between those defects which were to be regarded as irregularities only and those which were jurisdictional and therefore fatal. There is no ordinance and no law which says directly that the department of public works shall advertise for proposals or determine the bids or award the contracts, and there is no allegation that there was any defect or error in the advertising for proposals, or in the method of proceeding in conducting that part of the business. There is an allegation of fraud in fact in not awarding the contract to the lowest bidder and in the manner in which the bids were made, and this is the second objection urged against the validity of the proposed contract. The learned court below has found as a fact that there was no fraud or collusion on the part of the officers of the municipality and has thus determined that question against the appellant. There is not even an averment in the bill that there was any fraud or collusion on the part of the director of public safety or of the chief of the electrical bureau in considering the bids and awarding the contract, and the court also found that no fraud or collusion had been proven. Having carefully read the whole of the testimony we are obliged to say that we fully concur in that finding and that we can find no evidence in the case upon which to base such an accusation.

The only other contention on behalf of the appellant is that the bids of the several electric companies were fraudulent because the Philadelphia Electric Company was the owner of the majority of the stock of all those companies and therefore controlled the bidding; that the Brush Electric Company to whom the contract was awarded was unable to comply with its bid, and that to enable it to comply it would have to use the plants of the other companies; that there was no real competition between the several companies in making their bids and that it was well known to the officials making the bids and also to the department of

public safety that there was no real competition except between the Philadelphia Electric Company and the Kensington Electric Company. When it is considered that the Philadelphia Electric Company was not a bidder at all, and the Kensington Company only bid for one district which only contained 378 lights out of a total number of 7,694 lights for the whole city, it is impossible to see how a conclusion of fraud can with any propriety be drawn from such premises. The whole argument in support of the allegation of fraud in the bids is based, not upon proof of actual fraud, but upon inferences of a fraudulent intent because the individual companies put in bids in their individual capacities, and because the bid of the Brush Company for the Kensington Company's district was thirty cents per night, while the bid of the Kensington Company for that district was twenty cents. We cannot possibly assent to such an inference from such premises. What the city required was the lighting of the whole city, and it was the duty of the officials to determine what was the lowest responsible bid for all their requirements. It is no proof of fraud to show that in a bid in a single district, comprising less than one-twentieth part of the total number of the lights required, a lower price was bid by one company than the price named for that district in the bid that was accepted. If the aggregate of all the individual bids was greater than the single bid of the Brush Company for the whole it is difficult to see why the bid of that company for the whole is not lower than all other bids combined. There is certainly nothing illegal or fraudulent in each company putting in a bid for itself. Nor is there any propriety in an inference of fraud because one company which was not a bidder owns a majority of the stock of all the other bidding companies except the Kensington. Such ownership is authorized by law and is as consistent with absolute innocence of a fraudulent purpose as it is with guilt of such a purpose. The director of public safety testified that he accepted the lowest responsible bid for the whole contract and the figures bear him out in that statement. We concur with the learned court below in holding that the allegation of fraud in fact is not sustained. The assignments of error are all dismissed.

Decree affirmed and appeal dismissed at the cost of the appellant.