## Garr et al. v. Northampton County et al.

*Equity—Injunction—Township roads—Contracts by county commissioners — Controller — Acts of June 27, 1895, May 31, 1911, June 12, 1919, and March 10, 1921.*

1. County commissioners are authorized and empowered, under the provisions of the Acts of June 12, 1919, P. L. 450, and March 10, 1921, P. L. 26, to enter into contracts for improvement of any public highway in the county, including township roads.

2. A contract executed by two of the county commissioners to improve a public highway, following a written agreement with the State Highway Department by all the commissioners to enter into the contract for such improvement, is valid.

3. Contracts for the construction of township roads by county commissioners, under the provisions of the Acts of June 12, 1919, and March 10, 1921, do not require action or approval by the county controller.

Acts of June 27, 1895, P. L. 403, and May 31, 1911, P. L. 468, considered.

Motion to continue preliminary injunction. C. P. Northampton Co., April T., 1924, No. 3, in Equity.

*Calvin F. Smith,* for plaintiff.

*T. McKeen Chidsey,* for Washington and Plainfield Townships.

*H. M. Hagerman,* for Bangor Borough.

*A. F. Kahn,* County Solicitor, for Northampton County.

*James W. Fox,* for County Controller.

*James O. Campbell,* Deputy Attorney-General, and *John Shelley,* for Secretary of Highways.

*William H. Kirkpatrick,* for W. Grant Raub.

STOTZ, J., April 14, 1924.—The matter before us arises upon motion to continue a preliminary injunction until final hearing. At the suit of certain taxpayers of the county we granted a temporary injunction upon bill and affidavits, restraining the county commissioners, the contractor and the State Highway Commissioner from proceeding with the reconstruction of a certain road within the county under an alleged contract between the County of Northampton and W. Grant Raub, the contractor, and restraining the county controller from approving any warrants drawn in payment of the same and the county treasurer from honoring such warrants. Shall the injunction be continued or dissolved?

Garr et al. *v.* Northampton County et al.

The road in question is designated in this proceeding as the Belfast-Bangor highway. It crosses the Townships of Plainfield and Washington, and extends into the Borough of Bangor, all within the County of Northampton. The line of the proposed highway follows a present existing township road running from the village of Belfast to Bangor, and is about eight miles in length.

The inception of the proceedings to secure the construction of this proposed highway was an application made by the county commissioners to the State Highway Department in accordance with a form prescribed by the department, setting forth that this road is in need of reconstruction, that the county desires "to have said highway improved according to the standards of the State Highway Department," and that, therefore, the commissioners, on behalf of the county, petition the department "to make all necessary surveys and plans and to advertise and award contract or contracts for the County of Northampton for the improvement of said section of highway." The application further stipulated that the commissioners "do agree . . . to provide for the payment of, and to pay to the successful contractor from county funds, the total expense of said improvement," and to maintain the road after its construction. This application was executed by all of the three commissioners at a regular session assembled on Sept. 1, 1922.

On Oct. 28, 1922, the Supervisors of Plainfield and Washington Townships, respectively, submitted to the county commissioners a petition (using a form prescribed for that purpose, designated "Form No. 339"), setting forth that the road in question is in need of improvement, that the township desired to take advantage of the Act approved June 12, 1919, permitting counties of the Commonwealth of Pennsylvania to appropriate and expend moneys for the improvement and maintenance of State highways and State-aid highways, or any public highway in any county of the Commonwealth, etc.," and requesting "county aid" accordingly.

This was followed by a resolution on the part of the commissioners, at a regular session with all members present, reciting the presentation and the substance of the supervisors' petition, and setting forth that the county, through its said commissioners, agreed "to contribute 100 per cent. from (bond funds) towards the improvement of highway specified in the application of the said townships," provided the surveys, plans and specifications for said improvement shall be prepared or approved by the State Highway Department and work done under its supervision.

All of the foregoing applications and resolutions were submitted to, and approved by, the State Highway Department on Nov. 17, 1922. Subsequently, proceedings in all respects similar to those above recited were taken by and on behalf of the Borough of Bangor, with respect to the portion of the route lying within the borough, and the several applications, etc., were submitted to, and approved by, the department on Feb. 24, 1923.

Sometime during the year 1923, the exact date of which was not fixed, nor does it appear material, the townships and borough authorities, respectively, entered into agreements with the county commissioners, by which it was stipulated that the county should pay three-fourths of the cost of the road, "in relief of and for the assistance of" the respective townships and borough through which the road was to be built, and the townships and borough should pay the balance. In these agreements the townships and the borough severally stipulated that they had "sufficient borrowing capacity under the Constitution of Pennsylvania and the Acts of Assembly of the State of Pennsylvania to raise and fund the indebtedness hereinbefore mentioned, sufficient to cover the proportionate amount to be paid by the (townships-

Garr et al. *v.* Northampton County et al.

borough) under this agreement, and that all necessary resolutions for raising said moneys and authorizing the execution hereof have been adopted according to law."

All of the petitions and proceedings hereinbefore recited are set forth in full in the bill, and are marked Exhibits 1 to 6, inclusive. Upon the strength thereof, the Highway Department thereupon made the required surveys of the road, prepared the necessary plans, made estimates of the cost, and advertised for and received bids. The lowest bid was $378,232.74.

The next step in the matter, and which, in our view of the case, seems of great significance and importance, was an agreement entered into between the Commonwealth and the county, dated Oct. 1, 1923, and referred to as Exhibit No. 8. It was executed on behalf of the Commonwealth by the Secretary of Highways, and on behalf of the county by two of the commissioners, and it was approved by the county controller. This contract specifies, *inter alia*, that the Secretary of Highways has made all necessary surveys, has prepared the plans, has advertised for bids, that the cost of the road will be $378,232.74, "based upon the quantities and unit prices shown on the bid of the low bidder on file with the Department of Highways," and that the Secretary of Highways "will award for the County of Northampton contract or contracts for the improvement of the said road . . . in a sum not to exceed the amount of the aforesaid low bid." The agreement then stipulates that the county, after award by the Department of Highways, "shall enter into a contract with the successful contractor for the reconstruction of said road and shall defray the total cost and expense of said improvement, excluding all survey, engineering, advertising and inspection expenses," which shall be borne by the Commonwealth. It further provides that the "work done and material furnished under the aforementioned contract shall be under the supervision and conform to the standards of the Department of Highways," and that the county will provide for the maintenance of the road, after construction, "according to the standards of the Department of Highways."

In accordance with the terms of this agreement, a contract bearing date Oct. 2, 1923, providing for the construction of this road, was prepared by the Highway Department, which was duly executed by W. Grant Raub, the contractor, and by two of the county commissioners in behalf of the county. The contractor thereupon placed his construction plant upon the ground, engaged the necessary supplies and materials for the road, and was about to begin operations when he was interrupted by this injunction.

While the bill sets up as one of the grounds upon which the injunction should stand the alleged false representations of the township supervisors as to the financial standing and ability of the townships to bear their respective share of the expense of the new road, and that, because it now appears that the supervisors cannot raise out of current funds the necessary sums and have not obtained the assent of the electors of the townships to borrow the money required, the county commissioners have been fraudulently induced to enter into this contract, and that, therefore, the contract is improvident and illegal, counsel for the complainants abandoned this position at the argument, and based his contention that the injunction should be continued upon three main propositions, viz.: (1) That the contract is *ultra vires;* (2) that it was not authorized by any official action of the commissioners as a board in meeting assembled; and (3) that it did not have the approval of, and was not advertised by, the county controller, and that the method pursued in its award was contrary to the provisions of section 10 of the Act of June 27, 1895, P. L. 403, which defines the authority and duties of county controller.

Garr et al. *v.* Northampton County et al.

Is the contract *ultra vires?* Section 3 of the Act of April 15, 1834, P. L. 538, provides, *inter alia*, that counties shall have capacity as bodies corporate to take and hold "real estate and personal property . . . for such objects and purposes, and none other, as county . . . rates and levies are now, or hereafter may be, authorized by law to be laid and collected, and for such other objects and purposes as may hereafter be expressly authorized by law," and "to make contracts as may be necessary and proper for the execution of the same objects and purposes." It is plain that the Act of 1834, therefore, does not confer authority upon the county to make this contract. How, if at all, was the right given? If the county did not have the authority granted by the Commonwealth to enter into this contract and perform it, it follows that the injunction must be made permanent.

Under existing law, there are four classes of highways in Pennsylvania, viz.: State highways, State-aid highways, county roads and township roads. It is conceded that express authority is given to the several counties by various acts of assembly to build and maintain county roads. It is also conceded that the proposed highway is neither a State highway nor a county road. It is either a State-aid highway or a township road, and in neither case, the plaintiffs contend, does the county have authority to make a contract for its construction. By the terms of the Act of May 31, 1911, P. L. 468, under which State-aid highways are authorized, the share of the expense which the county or township shall contribute is paid into the State treasury, and the State makes the contracts and pays the bills. As to township roads, clearly the county has nothing to do with them, whether to open, build, reconstruct or maintain them, unless authority to do so may be found in the several acts of assembly, by virtue of which the State Highway Department and the county have so far proceeded in the matter. Let us examine these statutes. The Act of June 12, 1919, P. L. 450, as amended by the Act of March 10, 1921, P. L. 26, upon which the right of the county to make this contract must depend, provides that "any county of this Commonwealth may appropriate and expend moneys, and incur such indebtedness and issue bonds or other obligations therefor, as may be necessary to pay for the improvement and maintenance of any State highway or State-aid highway or any public highway within its proper limits: Provided, however, that no improvement can be made to any State highways or State-aid highways until the same has been submitted to and approved by the State Highway Department; and provided, further, that no county shall appropriate and expend any of such moneys for the improvement and maintenance of any public highway, other than a State highway or State-aid highway or county road, where the highway is to be improved jointly by the township or borough and county, until and unless the supervisors or commissioners of the township or borough council of the borough in which the highway proposed to be improved lies shall first petition the county commissioners of the county, representing that any highway or section thereof lying within such township or borough on which it is proposed that said money shall be expended is in need of reconstruction or repair, and particularly describing said highway, and until and unless the said application has been submitted to and approved by the State Highway Department: And provided, further, that when the improvement and maintenance of any public highway in the county is desired by the county without the intervention of the township or borough, the commissioners of said county may make application for approval direct to the State Highway Department."

We see, therefore, that the county has the right under this act to appropriate and expend money, not only for State highways and State-aid high-

ways, but for "any public highway within its proper limits," which includes not only county roads, but necessarily also township roads. It has already been noted that, prior to this act, the county had authority to expend money for and construct county roads. While the act does not in express language confer power upon the county to enter into a contract for the improvement of a township road, we are of the opinion that the power to appropriate and expend money for the improvement of a road necessarily implies and includes the power to pursue the only feasible method by which this may be done, viz., by a contract, unless, as in the case of a State-aid highway, the act specifies otherwise. Certainly the Act of 1919, nor any other act that has been brought to our attention, does not authorize the State to contract for the improvement of a purely township road, nor does it provide that the county shall pay either to the State or to the township the money that it proposes to appropriate and expend for this purpose. In fact, by the last proviso of the act, the county may proceed to improve "any public highway in the county," which includes a township road, "without the intervention of the township or borough," if it desires to do so. If this is so, and since the act expressly empowers the county to "expend" its money for this purpose, the argument now advanced, that the act of the county in making a contract to carry this provision into effect is *ultra vires*, would, if sound, render the act wholly vain and nugatory. It would not be feasible, even if they had the authority, for the county commissioners to go into the business of building roads, bridges, etc., directly, and especially scientifically constructed cement highways, such as this Belfast-Bangor road. The work must be done by those who know how, and who have the necessary facilities to do it, viz., by contractors who make it their business to build such roads. This applies also, even in a greater degree, to the township supervisors. If, under the Acts of 1919 and 1921, the most that the county could do would be to hand over to the supervisors of these two townships and to the officers of the borough the money which the county is to expend for this road, leaving it to them to build it, the result would be waste and confusion, with three contracts instead of one, and such a scheme certainly was not intended by the framers of these acts. We, therefore, conclude that the execution of the contract in suit was a valid exercise of authority lodged in the county commissioners.

But it is further objected by complainants, as their second ground of contention, although not strongly pressed at the argument, that the contract was not authorized by any official action of the commissioners as a board in meeting assembled. According to the testimony before us, the contract was not signed by the commissioners on the day it is dated. It was first transmitted by the department to the contractor, who executed it, and then forwarded to the commissioners. Because of the opposition of one of the commissioners to the project, a delay of several weeks ensued, during which the contract lay in a drawer of the commissioners' table in their office. The commissioners meet at regular stated intervals, and it appears that at one of these meetings, while the objecting commissioner, however, was temporarily out of the room, the contract was taken out of the drawer and signed by the other two. It further appears that no minute of this action was recorded by the clerk.

The actual signing of the contract was but the culmination or completion of the proceedings which were previously had in the matter, and as to which there is no complaint on the score of irregularity. As hereinbefore pointed out, the commissioners (all joining therein) had made application to the department for this road, wherein they agreed to contribute 100 per cent. of the cost. Later, they entered into a written agreement, Exhibit 8, with the

Commonwealth that the county, "after award by the Department of Highways, shall enter into a contract with the successful contractor, etc." The two signing commissioners, therefore, merely completed by their signatures what the commissioners as a body had previously agreed in a regular way they would do. The contract was attested by the commissioners' clerk, and the seal of the county was attached.

In Jefferson County *v.* Slagle, 66 Pa. 202, a case in which two of the commissioners went to a brickyard and made a contract for bricks to be used in the erection of a court-house, and in which the same question presented here was raised, Mr. Justice Williams, delivering the opinion of the court, says, at page 208: "The commissioners are the public agents of the county, and the law expressly provides that two of them shall form a board for the transaction of business, and when convened in pursuance of notice, or according to adjournment, shall be competent to perform all and singular the duties appertaining to their office. It is true that they are required to keep their offices at the seat of justice of the respective counties, but' it does not follow that they cannot make a valid and binding contract on behalf of the county, unless they make it in the office which they are required to keep, if such contract is in other respects within the scope of their authority. Nor has it been the practice of the commissioners to make contracts in behalf of the county only in 'the commissioners' office.' They have been in the habit of making contracts wherever it best suited their own convenience and the exigency of the public business. Why, then, should the validity of contracts so made be questioned or denied? If made within the scope of their authority, and without any fraud or collusion on their part, why should they not be valid and binding on the county wherever made? The statute does not declare contracts made out of 'the commissioners' office' illegal, and there is no rule or principle of the common law which renders them void. The contract in this case was within the scope of the commissioners' authority, and, under the provisions of the statute, the two commissioners had power to make it; and if they made the contract in their capacity as commissioners, as the jury have found, it is binding on the county."

We, therefore, hold that the complainants' second objection to the contract is without force.

We now come to the third, and what may be considered the most serious, point raised by the complainants, and that is the apparent conflict with the provisions of the County Controller Act of 1895 which the making of this contract presents.

Northampton County, having the number of inhabitants specified in the act, falls under its provisions, and the office of county auditor has been displaced by a controller. Section 4 of the act (Act of June 27, 1895) gives the controller "a general supervision and control of the fiscal affairs of the county and of the accounts and official acts of all officers and other persons who shall collect, receive or distribute the public moneys of the county, or who shall be charged with the management or custody thereof." Section 11 provides that "all warrants drawn on the county treasury by the commissioners on certificates as provided in the 8th, 9th and 10th sections of this act shall be countersigned by the controller." The 10th section of the act, to which the complainants particularly point in their contention that the act has been ignored and violated, reads as follows: "That from and after the passage of this act, all contracts made by the commissioners of said county involving an expenditure exceeding $100 shall be in writing, and shall, immediately after their execution, be filed with the controller; but no contract shall be made, nor the

payment thereof certified by the controller, for over $100, unless when made with the lowest and best bidder, after due notice to be published by the controller, when directed by the commissioners, if he approve the purpose of the proposals invited; all bids to be received by the controller under seal, and to be in his presence opened by the commissioners and the contracts awarded, of which awards the controller shall keep a record, and he shall certify no warrants for contracts not made agreeably thereto."

It is conceded by the defendants, and we so find, that this contract was not advertised by the controller, that he did not approve the purpose of the proposals invited (unless his approval of the agreement, Exhibit 8, amounted to such approval), that the bids were not received by him and were not opened and awarded by the commissioners in his presence. It would follow, therefore, that if this act is applicable to the matter in hand, and is mandatory, then, no matter how desirable and beneficent the Acts of 1919 and 1921, under which this highway is projected, may be, or what the settled practice of the State Highway Department by virtue of its provisions has been, this contract is invalid and the complainants are entitled to the relief prayed for.

The evident purpose of the Controller Act of 1895, and particularly section 10 thereof, was to safeguard the people of the several counties against improvident, collusive and dishonest, as well as illegal, contracts to which the county is a party, and to promote open and *bona fide* competition in placing its contracts. One of its objects is to secure for the county every advantage which a private corporation would seek in operations of a similar character, and to obtain as nearly as possible a dollar's worth of labor, brains and material for every dollar spent. It will not be contended that the practice of the Highway Department, which was pursued in guiding this project to its present stage and which culminated in the contract in suit, failed to include all the safeguards and advantages contemplated by the Act of 1895, and which would have accrued to the county if the matter had been handled alone by the county commissioners and the controller. Indeed, it must be conceded that the county was greatly benefited by the method pursued. It was shown at the hearing that the cost of the surveying, planning and supervising outlay in connection with this construction, all of which is borne by the State and not by the county, amounts to from 8 to 10 per cent. of the contract price. Furthermore, the county thereby derived the advantages of having a preliminary estimate, made by trained experts in the employ of the State, as to the maximum amount the road should cost before any bids were received and considered. It is not alleged that the contract was not awarded to the lowest and best bidder, as the Act of 1895 requires. Due notice was published by the Secretary of Highways in two county newspapers, exactly to the same effect and extent as if published over the name of the controller, and the various bids were received by the secretary and publicly opened at Harrisburg, at the time and place specified in the advertisement. All the steps and precautions contemplated by the Act of 1895 were, therefore, observed, but they were taken by the officers of the Commonwealth and not of the county. The question, therefore, arises whether the functions of the county controller, with respect to highway contracts of this character, are superseded by the acts under which this Belfast-Bangor road and similar highway projects are authorized, managed and constructed. If not, then the system which now prevails must be revised and broken up.

In the case of Erie R. R. Co. *v.* The Public Service Commission, 77 Pa. Superior Ct. 196, Judge Head says, at page 204: "In 1911 the Legislature of Pennsylvania appears to have finally determined it would no longer attempt

to expand or develop the then existing system of road-making in the Commonwealth. Long years of painful experience had at last brought the conviction that if we were to look forward to a system of highways that could, in time, be developed so as to reasonably meet the necessities of the State and the demands of its people, the foundations of that system must be laid by the State itself. They must needs be as broad as our territory. Their design and the execution of that design must be marked by that unity of purpose and effort which is the attribute of the sovereign and must be supported by a never-failing stream of financial aid, the source of which could only be the taxing power of the Commonwealth."

The Act of May 31, 1911, P. L. 468, provides not only for State highways, but also for State-aid highways. Section 34 of the act defines a "State-aid highway" as "such highway as is improved with the aid and co-operation of the State with county and township, or with county or township, borough or incorporated town, either or severally, as the case may be, according to the terms and provisions hereof." The act provides, in case of State-aid highways, that the county or township shall contribute at least 50 per cent. of the cost of the road, and that the work of construction shall be exclusively in charge of the State. Before aid shall be given by the State, an agreement must be entered into by the county or township with the State, which shall provide not only for the payment of the county's or township's share, and for the observance of and compliance with all the other details specified in the act, but the act (see section 22) further stipulates that where this has been done, "the State Highway Commission shall then advertise for bids and let contract or contracts for the improvement of the road desired to be improved, in the manner herein provided in the case of improvement of State highways." It will be noted that under the Act of 1911 the share of the county shall be paid over to the State Treasurer, upon warrant of the county commissioners, "in such sum or sums as shall be certified by the State Highway Commissioner from time to time during the performance of the work or contract, or as provided by the contract, and, otherwise, by the provisions hereof, after the same shall be completed." The cost of the improvement, etc., "where properly certified by the State Highway Commissioner, shall be audited by the Auditor General."

It will be seen, therefore, that in the case of State-aid highways, the county furnishes at least half the cost of the road, but instead of paying it direct to the contractor, it pays the money to the State Treasurer, to be disbursed by him, and the county controller has nothing whatever to do with the advertising for bids or with the approval and letting of the contract.

It is contended on behalf of some of the defendants that, because the State will contribute a sum amounting to from 8 to 10 per cent. of the contract price of the road by way of surveying, planning, estimating, supervising and inspecting expenses, this road will be improved "with the aid and co-operation of the State," and that, therefore, it is a "State-aid" road according to the definition of that term in section 34 of the act, and the county controller has consequently nothing to do with the matter. But this position seems untenable when we take into consideration the general scheme of the act. The "aid and co-operation" to be given by the State under the Act of 1911 consists not only of the activities of the Highway Department in planning and managing the construction, but more particularly in paying up to 50 per cent. of the contract price. In the present case, the State pays nothing to the contractor, but the county pays 100 per cent. Furthermore, the county does not pay its money to the State, to be disbursed by the State officers, but

direct to the contractor. Again, the cost of the maintenance of the road after its construction falls wholly upon the county; whereas, under the State-aid Act, the State shares this expense. For these reasons, and others which might be pointed out, we are not impressed with the argument that the controller has no function to perform on the ground that this is a State-aid highway. Our conclusions are based upon other considerations.

It will be perceived, as we have already pointed out, that under the Act of 1911 a county may appropriate and expend county funds for roads within its borders without the intervention of the county controller. While the act seems to contemplate that the State and county shall each pay half of the cost, yet it will be noted that in section 21 of the act it is specified that the State "shall not in any case pay *more* than fifty (50) per centum, etc." This naturally implies that some other proportion may be agreed upon, so long as the State is not required to pay above 50 per cent. If, therefore, it should be agreed that the State should contribute 10 per cent. and the county 90 per cent., the status of the controller would not thereby be affected. Under the Acts of 1919 and 1921 the county pays 100 per cent. Does that fact, together with the further fact that under these later acts the contract is put in the name of the county instead of the State, and that the money is paid direct to the contractor by the county instead of to the State Treasurer, and by him to the contractor, but all under the direction, supervision and control of the State, thereby necessarily call into action the function of the controller?

The Acts of 1919 and 1921 must be viewed as a part of the broad, general scheme whereby the State purposes to create a system of highways which, as was said by Judge Head in Erie R. R. Co. *v.* The Public Service Commission, 77 Pa. Superior Ct. 196, "could in time be developed so as to reasonably meet the necessities of the State and the demands of the people." The "execution of that design must be marked by that unity of purpose and effort which is the attribute of the sovereign." It cannot be attained by the independent and disjointed action of the separate counties, townships and boroughs. No matter from what source the revenue is to come, it can only be accomplished under the direction, approval and control of a single, efficient agency, and that is a State Highway Department. In order that the scheme may be coherent and effective, the department must have not only general supervision of the road-building program as it develops, but the control of every step in the program. It is to the interest of the whole people, and especially to the people of the particular county or township who must furnish the money, that this should be so. It would be futile for the State to survey, plan and inspect a road if it had no say in the letting of a contract to build it. By the plain intent of the Acts of 1919 and 1921, a road project of this character can be carried forward only with the approval of the Highway Department, and is meant to be in harmony with the State-aid Act of 1911. The central idea of this legislation, when read in connection with previous acts, and particularly with the Act of 1911, is to furnish a method whereby local communities may secure and accelerate State-constructed highways in their midst, if they have the means and the will to pay for them. Instead of waiting until the State may be willing or able to join with them in building the proposed road as a State-aid highway, they can have the road presently, provided they will co-operate with the State in the manner provided in the Act of 1921 and pay for it. That this is a correct view is further supported by section 1906, Act of June 7, 1923, P. L. 597, which reads as follows:

"*Township Roads.*—The Department of Highways shall have the power, and its duty shall be:

"*(a)* To have general supervision over all township highways and bridges constructed, improved or maintained in whole or in part by the aid of State moneys, and to approve all agreements made by township supervisors for the expenditure of moneys appropriated by the State for road purposes;

"*(b)* To approve plans and specifications and estimates for the erection and repair of township bridges and culverts, and for the construction and maintenance of township highways; but such plans and specifications shall not be approved unless they conform to the standards of the department, and no contract for the repair or construction of any township bridge or culvert, or for the reconstruction of a township road, shall be valid unless such contract is in accordance with plans prescribed, or unless plans, specifications and estimates have been prepared or approved by the department."

What is the meaning of the word "approval," as used in the Act of 1921? Does it signify merely approval of the application for the road, or does it comprehend the supervision and sanction of all the various steps leading up to the contract, including the contract itself and its performance? The Highway Department, since 1919, has construed it to mean the latter, and in many road projects all over the State, involving tens of millions of dollars, has acted upon that construction in the same manner as was done in the present case. The word "approval," as construed and acted upon by the department, included the preparation of plans and specifications, the question of type of construction, the grading, the drainage, the grades and curves, the advertisement for and receipt and opening of bids, comparison of the bids with the previous estimates made by the department engineers, and the awarding of the contract. The "approval" of the department would be a vain and empty thing if it did not cover all the steps and means through which the object contemplated by the act was to be accomplished, to wit, the proper and economical construction of the road in accordance with the standards of the Highway Department. Section 1906 of the Act of 1923, above quoted, uses the word "supervision" in a similar connection, and to supervise, according to the Century Dictionary, means "to oversee, have charge of, with authority to direct or regulate." Furthermore, that the construction placed by the department upon the act, with respect to the extent of its powers and duties under it, was understood and agreed to by the county is shown by the express language of the agreement between the county and the State, Exhibit No. 8, wherein all the various steps culminating in the contract are explicitly set forth; and this agreement was not only executed by the commissioners, but approved by the controller. If the legislature had intended to restrict the meaning of the words "approval" or "supervision," it would have added qualifying words, and the fact that they did not designate the items or circumscribe the scope of approval, would indicate that it was intended in an unrestricted sense.

Undoubtedly it was the intention of the legislature to give the construction of township roads under the Acts of 1919 and 1921 the same status as State-aid highways, so far as the steps preliminary to the contract are concerned. We have already pointed out that in the case of a State-aid highway there is no requirement on the part of the controller to advertise, etc.; his functions have been superseded by the Act of 1911. If that is so, and if the State-supervised township roads under the Acts of 1919 and 1921 have the same status as State-aid roads with respect to everything else except method and extent of payment therefor and the name under which the contract is taken, it follows that here also the controller's duties have been superseded by these acts. At most, his duties should be merely ministerial. Moreover, it would

be a useless proceeding for the controller to advertise, independent of, and additional to, the notice given by the department, and would only cause extra expense and delay without accomplishing any purpose.

The reason for advertisement by him, as contemplated by the Act of 1895, ceased to exist, and the maxim *cessante ratione legis cessat et ipsa lex* would apply. This doctrine is applicable in a proper case to the provisions of statutory law as well as to common law: Silsby Manuf. Co. *v.* Allentown, 153 Pa. 319-323; Chapman *v.* Faith, 18 Pa. Superior Ct. 578-584. In the Silsby Manuf. Co. case, the court say, at page 324: "The law does not insist on what is impossible or absolutely useless. Advertising for proposals in this case would have been worse than useless, since it could have resulted in nothing but dangerous delay and an idle expenditure of money." If the county had had the right to let this contract without the approval of the State, advertisement by the controller and the other steps specified by the Act of 1895 would have been required, but, as we have already seen, such was not the case.

In the case of Potts *v.* City of Philadelphia, 195 Pa. 619, there was some doubt, under the charter and ordinances of the city, whether the power to advertise for proposals and determine bids for electric lighting belonged to the Department of Public Safety or of Public Works. A taxpayers' bill was filed to enjoin the execution of the contract on the ground that it should have been advertised by the Department of Public Works instead of the Department of Public Safety. The court held that it was "highly probable" that the power belonged to the Department of Public Safety, and sustained the contract. But the court decided that, even conceding that the duty of advertising belonged to the Department of Public Works, and that the bids were advertised by the wrong department, the contract was still good. The court said, at page 631: "It is not of sufficient consequence, however, to follow out this line of thought, as it will be readily seen that there might easily exist a contrariety of opinion as to which one of the two great departments of public safety or public works possessed the preliminary jurisdiction of conducting the bidding for the contracts. Even conceding that it belonged to the Department of Public Works to advertise for proposals and determine the bids, the same work could be far better done by the Department of Public Safety, which possessed all the facilities for conducting that part of the business, and it would amount to nothing more than an irregularity in the method of proceeding prior to the preparation and execution of the contract, which must be signed by the mayor and countersigned by the controller, in any event. Such irregularities do not present any sufficient reason for enjoining those officials from performing their duties in the execution of the contract."

In this connection, we would also refer to the cases of City of Philadelphia *v.* Gorgas, 180 Pa. 296; City of Erie *v.* Moody, 176 Pa. 478; Fell *v.* Philadelphia, 81 Pa. 58, and Philadelphia County *v.* City of Pittsburgh, 253 Pa. 147.

It will thus be seen that the courts have recognized instances and occasions when compliance with the strict letter of the law on the subject was not deemed essential to the validity of municipal contracts. We have here substantial compliance with the law in every detail, if we look to the spirit and not merely the letter of the law. Furthermore, we have the ratification and approval by the county commissioners and by the controller himself of the Highway Department's action with respect to the advertising and award of the contract, as shown by the agreement, Exhibit 8. And, finally, if our construction of the Acts of 1919 and 1921 is correct, the controller had no duties to perform in the making of this contract.

We, therefore, conclude that none of the objections raised by complainants are valid. There is every reason, from the viewpoint of a wise, prudent, efficient and economical system, why the contract should be sustained. There is none, from a legal standpoint, that is imperative why it must be set aside.

The motion to continue the injunction is, therefore, denied, and the preliminary injunction heretofore granted is dissolved, the costs of the preliminary injunction and proceedings to be paid by the plaintiff.

From Henry D. Maxwell, Easton, Pa.